## EMPLOYMENT AGREEMENT

AGREEMENT by and between LEE ENTERPRISES, INCORPORATED, a Delaware corporation (the "Company") and Colleen Birdnow Brown (the "Executive"), dated as of the 1st day of March, 2000 (the "Effective Date").

## RECITAL:

The Board of Directors of the Company (the "Board"), has determined that it is in the best interests of the Company and its shareholders to assure that the Company will have the continued dedication of the Executive, notwithstanding the possible occurrence of a Business Combination (as defined below) of the Company. The Board believes it is imperative to diminish the inevitable distraction of the Executive by virtue of the personal uncertainties and risks created by a possible Business Combination and to encourage the Executive's full attention and dedication to the Company currently and in the event of any Business Combination, and to provide the Executive with compensation and benefits arrangements upon the occurrence of a Business Combination which ensure that the compensation and benefits expectations of the Executive will be satisfied. Therefore, in order to accomplish these objectives, the Board has caused the Company to enter into this Agreement.

NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:

1. Certain Definitions.

(a)     The "Contract Period" shall mean the period commencing on the date hereof and ending on the second anniversary of the date hereof; provided, however, that commencing on the date two years after the date hereof, and on each annual anniversary of such date (such date and each annual anniversary thereof shall be hereinafter referred to as the "Renewal Date"), the Contract Period shall be automatically extended so as to terminate one year from such Renewal Date, unless at least 60 days prior to the Renewal Date the Company shall give notice to the Executive that the Contract Period shall not be so extended.

(b)     "Class B Common Stock" shall mean the Class B common stock, par value $2.00 per share, of the Company.

(c)     "Common Shares" shall mean the shares of Common Stock and Class B Common Stock treated as one class.

(d)     "Common Stock" shall mean the common stock, par value $2.00 per share, of the Company.

2.     Business Combination.   For the purpose of this Agreement, a "Business Combination" shall mean the consummation of a reorganization, merger or consolidation, or sale or other disposition in one or more transactions within the Contract Period, of all or substantially



**EXHIBIT**

A

all of the assets of the Company comprising the "Broadcast Segment" as described in the Company's Annual Report on Form 10-K, excluding KMAZ-TV, El Paso, TX.

3.   Employment Period. The Company hereby agrees to continue the Executive in its employ, and the Executive hereby agrees to remain in the employ of the Company subject to the terms and conditions of this Agreement, for the period (the "Employment Period") commencing on the Effective Date and ending on the second anniversary of the date on which the Business Combination (or, if more than one, on the date of the last such Business Combination) occurs (the "Closing Date").

4.   Terms of Employment. (a) Position and Duties. (i) During the Employment Period, the Executive's position, authority, duties and responsibilities shall be at least commensurate in all material respects with the most significant of those held, exercised and assigned at any time during the 120-day period immediately preceding the Effective Date.

(ii)   During the Employment Period, and excluding any periods of vacation and sick leave to which the Executive is entitled, the Executive agrees to devote reasonable attention and time during normal business hours to the business and affairs of the Company and, to the extent necessary to discharge the responsibilities assigned to the Executive hereunder, to use the Executive's reasonable best efforts to perform faithfully and efficiently such responsibilities. During the Employment Period it shall not be a violation of this Agreement for the Executive to (A) serve on corporate, civic or charitable boards or committees, (B) deliver lectures, fulfill speaking engagements or teach at educational institutions and (C) manage personal investments, so long as such activities do not significantly interfere with the performance of the Executive's responsibilities as an employee of the Company in accordance with this Agreement. It is expressly understood and agreed that to the extent that any such activities have been conducted by the Executive prior to the Effective Date, the continued conduct of such activities (or the conduct of activities similar in nature and scope thereto) subsequent to the Effective Date shall not thereafter be deemed to interfere with the performance of the Executive's responsibilities to the Company.

(b)   Compensation. (i) Base Salary. During the Employment Period, the Executive shall receive an annual base salary ("Annual Base Salary"), which shall be paid at a monthly rate, at least equal to the annual base salary payable, including any base salary which has been earned but deferred, to the Executive by the Company and its affiliated companies as of the Effective Date of this Agreement. During the Employment Period, the Annual Base Salary shall be reviewed no more than 12 months after the last salary increase awarded to the Executive prior to the Effective Date and thereafter at least annually. Any increase in Annual Base Salary shall not serve to limit or reduce any other obligation to the Executive under this Agreement. Annual Base Salary shall not be reduced after any such increase and the term Annual Base Salary as utilized in this Agreement shall refer to Annual Base Salary as so increased. As used in this Agreement, the term "affiliated companies" shall include any company controlled by, controlling or under common control with the Company.

(ii)   <u>Annual Bonus</u>.  In addition to Annual Base Salary, the Executive shall be awarded, for each fiscal year ending during the Employment Period, an annual bonus in cash based upon mutually agreed-upon performance objectives for each fiscal year of the Company during the Employment Period (annualized in the event that the Executive is not employed by the Company for the whole of such fiscal year) (the "Annual Bonus").  Each such Annual Bonus shall be paid in one or more installments during or no later than the end of the third month of the fiscal year next following the fiscal year for which the Annual Bonus is awarded, unless the Executive shall elect to defer the receipt of such Annual Bonus.  The Company and the Executive agree that the Annual Bonus for the fiscal year ending September 30, 2000 shall be the aggregate of (A) $75,000 and (B) the incentive bonus calculated as described on Appendix 1 to this Agreement.

(iii)   <u>Incentive, Savings and Retirement Plans</u>.  During the Employment Period, the Executive shall be entitled to participate in all stock option and incentive, savings and retirement plans, practices, policies and programs applicable generally to other peer executives of the Company and its affiliated companies, but in no event shall such plans, practices, policies and programs provide the Executive with incentive opportunities (measured with respect to both regular and special incentive opportunities, to the extent, if any, that such distinction is applicable), savings opportunities and retirement benefit opportunities, in each case, less favorable, in the aggregate, than the most favorable of those provided by the Company and its affiliated companies for the Executive under such plans, practices, policies and programs as in effect at any time during the 120-day period immediately preceding the Effective Date or if more favorable to the Executive, those provided generally at any time after the Effective Date to other peer executives of the Company and its affiliated companies.

(iv)   <u>Welfare Benefit Plans</u>.  During the Employment Period, the Executive and/or the Executive's family, as the case may be, shall be eligible for participation in and shall receive all benefits under welfare benefit plans, practices, policies and programs provided by the Company and its affiliated companies (including, without limitation, medical, prescription, dental, disability, employee life, group life, accidental death and travel accident insurance plans and programs) to the extent applicable generally to other peer executives of the Company and its affiliated companies, but in no event shall such plans, practices, policies and programs provide the Executive with benefits which are less favorable, in the aggregate, than the most favorable of such plans, practices, policies and programs in effect for the Executive at any time during the 120-day period immediately preceding the Effective Date or, if more favorable to the Executive, those provided generally at any time after the Effective Date to other peer executives of the Company and its affiliated companies.

(v)   <u>Expenses</u>.  During the Employment Period, the Executive shall be entitled to receive prompt reimbursement for all reasonable expenses incurred by the Executive in accordance with the most favorable policies, practices and procedures of the Company and its affiliated companies in effect for the Executive at any time during the 120-day period immediately preceding the Effective Date or, if more favorable to the Executive, as in effect generally at any time thereafter with respect to other peer executives of the Company and its affiliated companies.

(vi)    Fringe Benefits.  During the Employment Period, the Executive shall be entitled to fringe benefits, including, without limitation, tax and financial planning services, payment of membership or club dues, and, if applicable, use of an automobile and payment of related expenses, in accordance with the most favorable plans, practices, programs and policies of the Company and its affiliated companies in effect for the Executive at any time during the 120-day period immediately preceding the Effective Date or, if more favorable to the Executive, as in effect generally at any time thereafter with respect to other peer executives of the Company and its affiliated companies.

(vii)    Office and Support Staff.  During the Employment Period, the Executive shall be entitled to an office or offices of a size and with furnishings and other appointments, and to personal secretarial and other assistance, at least equal to the most favorable of the foregoing provided to the Executive by the Company and its affiliated companies at any time during the 120-day period immediately preceding the Effective Date or, if more favorable to the Executive, as provided generally at any time thereafter with respect to other peer executives of the Company and its affiliated companies.

(viii)    Vacation.  During the Employment Period, the Executive shall be entitled to paid vacation (not less than four (4) weeks) in accordance with the most favorable plans, policies, programs and practices of the Company and its affiliated companies as in effect for the Executive at any time during the 120-day period immediately preceding the Effective Date or, if more favorable to the Executive, as in effect generally at any time thereafter with respect to other peer executives of the Company and its affiliated companies.

5.    Termination of Employment.  (a) Death or Disability.  The Executive's employment shall terminate automatically upon the Executive's death during the Employment Period.  If the Company determines in good faith that the Disability of the Executive has occurred during the Employment Period (pursuant to the definition of Disability set forth below), it may give to the Executive written notice in accordance with Section 13(b) of this Agreement of its intention to terminate the Executive's employment.  In such event, the Executive's employment with the Company shall terminate effective on the 30th day after receipt of such notice by the Executive (the "Disability Effective Date"), provided that, within the 30 days after such receipt, the Executive shall not have returned to full-time performance of the Executive's duties.  For purposes of this Agreement, "Disability" shall mean the absence of the Executive from the Executive's duties with the Company on a full-time basis for 180 consecutive business days as a result of incapacity due to mental or physical illness which is determined to be total and permanent by a physician selected by the Company or its insurers and acceptable to the Executive or the Executive's legal representative.

(b)    Cause.  The Company may terminate the Executive's employment during the Employment Period for Cause.  For purposes of this Agreement, "Cause" shall mean:

(i)    the willful and continued failure of the Executive to perform substantially the Executive's duties with the Company or one of its affiliates (other than any such fail-

ure resulting from incapacity due to physical or mental illness), for a period of fifteen (15) days after a written demand for substantial performance is delivered to the Executive by the Board or the Chief Executive Officer of the Company which specifically identifies the manner in which the Board or Chief Executive Officer believes that the Executive has not substantially performed the Executive's duties;

(ii)    the willful engaging by the Executive in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company.

(iii)    the Executive's conviction of a felony under the laws of the United States or any state thereof.

For purposes of this provision, no act or failure to act, on the part of the Executive, shall be considered "willful" unless it is done, or omitted to be done, by the Executive in bad faith or without reasonable belief that the Executive's action or omission was in the best interests of the Company. Any act, or failure to act, based upon authority given pursuant to a resolution duly adopted by the Board or upon the instructions of the Chief Executive Officer or a senior officer of the Company or based upon the advice of counsel for the Company shall be conclusively presumed to be done, or omitted to be done, by the Executive in good faith and in the best interests of the Company. The cessation of employment of the Executive shall not be deemed to be for Cause unless and until there shall have been delivered to the Executive a copy of a resolution duly adopted by the affirmative vote of not less than three-quarters of the entire membership of the Board at a meeting of the Board called and held for such purpose (after reasonable notice is provided to the Executive and the Executive is given an opportunity, together with counsel, to be heard before the Board), finding that, in the good faith opinion of the Board, the Executive is guilty of the conduct described in subparagraph (i) or (ii) above, and specifying the particulars thereof in detail.

(c)    Good Reason. The Executive's employment may be terminated by the Executive for Good Reason during the Employment Period. For purposes of this Agreement, "Good Reason" shall mean:

(i)    the assignment to the Executive of any duties inconsistent in any respect with the Executive's position, authority, duties or responsibilities as contemplated by Section 4(a) of this Agreement, or any other action by the Company which results in a diminution in such position, authority, duties or responsibilities, excluding for this purpose an isolated, insubstantial and inadvertent action not taken in bad faith and which is remedied by the Company promptly after receipt of notice thereof given by the Executive;

(ii)    any failure by the Company to comply with any of the provisions of Section 4(b) of this Agreement, other than an isolated, insubstantial and inadvertent failure not occurring in bad faith and which is remedied by the Company promptly after receipt of notice thereof given by the Executive;

5

(iii)     any purported termination by the Company of the Executive's employment otherwise than as expressly permitted by this Agreement; or

(iv)     any failure by the Company to comply with and satisfy Section 11(c) of this Agreement in connection with the consummation of the Business Combination; or

(v)     the requirement that the Executive relocate, move to or work out of a geographic location which is more than 50 miles away than her current location.

For purposes of this Section 5(c), any good faith determination of "Good Reason" made by the Executive shall be conclusive.  Anything in this Agreement to the contrary notwithstanding, a termination by the Executive for any reason during the 30-day period immediately following the first anniversary of the Effective Date shall be deemed to be a termination for Good Reason for all purposes of this Agreement.

(d)     Notice of Termination.  Any termination by the Company for Cause, or by the Executive for Good Reason, shall be communicated by Notice of Termination to the other party hereto given in accordance with Section 13(b) of this Agreement.  For purposes of this Agreement, a "Notice of Termination" means a written notice which (i) indicates the specific termination provision in this Agreement relied upon, (ii) to the extent applicable, sets forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision so indicated and (iii) if the Date of Termination (as defined below) is other than the date of receipt of such notice, specifies the termination date (which date shall be not more than thirty days after the giving of such notice).  The failure by the Executive or the Company to set forth in the Notice of Termination any fact or circumstance which contributes to a showing of Good Reason or Cause shall not waive any right of the Executive or the Company, respectively, hereunder or preclude the Executive or the Company, respectively, from asserting such fact or circumstance in enforcing the Executive's or the Company's rights hereunder.

(e)     Date of Termination.  "Date of Termination" means (i) if the Executive's employment is terminated by the Company for Cause, or by the Executive for Good Reason, the date of receipt of the Notice of Termination or any later date specified therein, as the case may be, (ii) if the Executive's employment is terminated by the Company other than for Cause or Disability, the Date of Termination shall be the date on which the Company notifies the Executive of such termination and (iii) if the Executive's employment is terminated by reason of death or Disability, the Date of Termination shall be the date of death of the Executive or the Disability Effective Date, as the case may be.

6.     Obligations of the Company upon Termination.  (a) Good Reason; Other Than for Cause, Death or Disability.  If, during the Employment Period, the Company shall terminate the Executive's employment other than for Cause or Disability or the Executive shall terminate employment for Good Reason:

(i)     the Company shall pay to the Executive in a lump sum in cash within 30 days after the Date of Termination the aggregate of the following amounts:

6

A.      the sum of (1) the Executive's Annual Base Salary through the Date of Termination to the extent not theretofore paid, (2) the Annual Bonus earned, including any bonus or portion thereof which has been earned but deferred (and annualized for any fiscal year consisting of less than twelve full months or during which the Executive was employed for less than twelve full months), for the current fiscal year during the Employment Period, if any, multiplied by a fraction, the numerator of which is the number of days in the current fiscal year through the end of the month closest to the Date of Termination, and the denominator of which is 365, and (3) any compensation previously deferred by the Executive (together with any accrued interest or earnings thereon) and any accrued vacation pay, in each case to the extent not theretofore paid (the sum of the amounts described in clauses (1), (2), and (3) shall be hereinafter referred to as the "Accrued Obligations"); and

B.      the amount equal to either (1) $570,000 if the Date of Termination occurs on or prior to the Closing Date (except as provided in clause (2) below), or (2) if the Date of Termination occurs after the Closing Date or if the Executive's employment with the Company is terminated prior to the Closing Date, and if it is reasonably demonstrated by the Executive that such termination of employment was at the request of a third-party with whom the Company had previously contracted to effect a Business Combination or otherwise arose in connection with or anticipation of the Business Combination, the sum of the Executive's Annual Base Salary and Annual Bonus payable for the current fiscal year (which Annual Bonus, solely for purposes of this Section 6(a)(i)(B)(2), shall not be less than sixty-three (63%) percent of the Executive's Annual Base Salary) multiplied by two; and

C.      an amount equal to the aggregate of the annual contributions payable by the Company under its qualified defined contribution retirement plan and any excess or supplemental retirement plan in which the Executive participates in respect of any payment made under clause (B) of this Section 6(a), assuming for this purpose that all accrued benefits are fully vested, and, assuming that the Executive's compensation is that required by Section 4(b)(i) and Section 4(b)(ii).

(ii)     for one year after the Executive's Date of Termination, or such longer period as may be provided by the terms of the appropriate plan, program, practice or policy, the Company shall continue benefits to the Executive and/or the Executive's family at least equal to those which would have been provided to them in accordance with the plans, programs, practices and policies described in Section 4(b)(iv) of this Agreement if the Executive's employment had not been terminated or, if more favorable to the Executive, as in effect generally at any time thereafter with respect to other peer executives of the Company and its affiliated companies and their families, provided, however, that if the Executive becomes reemployed with another employer and is eligible to receive medical or other welfare benefits under another employer provided plan, the medical and

7

other welfare benefits described herein shall be secondary to those provided under such other plan during such applicable period of eligibility. For purposes of determining eligibility (but not the time of commencement of benefits) of the Executive for retiree benefits pursuant to such plans, practices, programs and policies, the Executive shall be considered to have remained employed until one year after the Date of Termination and to have retired on the last day of such period;

(iii)   the Company shall, at its sole expense as incurred, provide the Executive with outplacement services and reimbursement for legal expenses in an amount not to exceed $10,000, in the aggregate, the scope and provider of which shall be selected by the Executive in her sole discretion; and

(iv)   to the extent not theretofore paid or provided, the Company shall timely pay or provide to the Executive any other amounts or benefits required to be paid or provided or which the Executive is eligible to receive under any plan, program, policy or practice or contract or agreement of the Company and its affiliated companies (such other amounts and benefits shall be hereinafter referred to as the "Other Benefits").

(b)   <u>Incentive Plan</u>. The Company shall vest the Executive fully under the Company's 1990 Long Term Incentive Plan (the "Incentive Plan") in respect of all stock options and restricted stock awards granted, outstanding and unexercised, as if and to the full extent that a "Change of Control" had occurred under the Incentive Plan, if the Executive is entitled to the benefits described in Section 6 (a)(i) above. Such vesting shall occur on the earlier of the Date of Termination or the Closing Date. The Executive shall be entitled to exercise any non-qualified stock options for a period of three (3) years after the date such options shall fully vest.

(c)   <u>Death</u>. If the Executive's employment is terminated by reason of the Executive's death during the Employment Period, this Agreement shall terminate without further obligations to the Executive's legal representatives under this Agreement, other than for payment of Accrued Obligations and the timely payment or provision of Other Benefits. Accrued Obligations shall be paid to the Executive's estate or beneficiary, as applicable, in a lump sum in cash within 30 days of the Date of Termination. With respect to the provision of Other Benefits, the term Other Benefits as utilized in this Section 6(c) shall include, without limitation, and the Executive's estate and/or beneficiaries shall be entitled to receive, benefits at least equal to the most favorable benefits provided by the Company and affiliated companies to the estates and beneficiaries of peer executives of the Company and such affiliated companies under such plans, programs, practices and policies relating to death benefits, if any, as in effect with respect to other peer executives and their beneficiaries at any time during the 120-day period immediately preceding the Effective Date or, if more favorable to the Executive's estate and/or the Executive's beneficiaries, as in effect on the date of the Executive's death with respect to other peer executives of the Company and its affiliated companies and their beneficiaries.

(d)     Disability.  If the Executive's employment is terminated by reason of the Executive's Disability during the Employment Period, this Agreement shall terminate without further obligations to the Executive, other than for payment of Accrued Obligations and the timely payment or provision of Other Benefits.  Accrued Obligations shall be paid to the Executive in a lump sum in cash within 30 days of the Date of Termination.  With respect to the provision of Other Benefits, the term Other Benefits as utilized in this Section 6(d) shall include, and the Executive shall be entitled after the Disability Effective Date to receive, disability and other benefits at least equal to the most favorable of those generally provided by the Company and its affiliated companies to disabled executives and/or their families in accordance with such plans, programs, practices and policies relating to disability, if any, as in effect generally with respect to other peer executives and their families at any time during the 120-day period immediately preceding the Effective Date or, if more favorable to the Executive and/or the Executive's family, as in effect at any time thereafter generally with respect to other peer executives of the Company and its affiliated companies and their families.

(e)     Cause; Other than for Good Reason.  If the Executive's employment shall be terminated for Cause during the Employment Period, this Agreement shall terminate without further obligations to the Executive other than the obligation to pay to the Executive (x) her Annual Base Salary through the Date of Termination, (y) the amount of any compensation previously deferred by the Executive, and (z) Other Benefits, in each case to the extent theretofore unpaid.  If the Executive voluntarily terminates employment during the Employment Period, excluding a termination for Good Reason, this Agreement shall terminate without further obligations to the Executive, other than for Accrued Obligations and the timely payment or provision of Other Benefits.  In such case, all Accrued Obligations shall be paid to the Executive in a lump sum in cash within 30 days of the Date of Termination.

7.     Non-exclusivity of Rights.  Nothing in this Agreement shall prevent or limit the Executive's continuing or future participation in any plan, program, policy or practice provided by the Company or any of its affiliated companies and for which the Executive may qualify, nor, subject to Section 13(e), shall anything herein limit or otherwise affect such rights as the Executive may have under any contract or agreement with the Company or any of its affiliated companies.  Amounts which are vested benefits or which the Executive is otherwise entitled to receive under any plan, policy, practice or program of or any contract or agreement with the Company or any of its affiliated companies at or subsequent to the Date of Termination shall be payable in accordance with such plan, policy, practice or program or contract or agreement except as explicitly modified by this Agreement.

8.     Full Settlement.  The Company's obligation to make the payments provided for in this Agreement and otherwise to perform its obligations hereunder shall not be affected by any set-off, counterclaim, recoupment, defense or other claim, right or action which the Company may have against the Executive or others.  In no event shall the Executive be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to the Executive under any of the provisions of this Agreement and such amounts shall not be reduced whether or not the Executive obtains other employment.  The Company agrees to pay as

incurred, to the full extent permitted by law, all legal fees and expenses which the Executive may reasonably incur as a result of any contest (regardless of the outcome thereof) by the Company, the Executive or others of the validity or enforceability of, or liability under, any provision of this Agreement or any guarantee of performance thereof (including as a result of any contest by the Executive about the amount of any payment pursuant to this Agreement), plus in each case interest on any delayed payment at the applicable Federal rate provided for in Section 7872(f)(2)(A) of the Internal Revenue Code of 1986, as amended (the "Code").

9.   Certain Additional Payments by the Company.

(a)    Anything in this Agreement to the contrary notwithstanding and except as set forth below, in the event it shall be determined that any payment or distribution by the Company or its affiliates to or for the benefit of the Executive (whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise, but determined without regard to any additional payments required under this Section 9) (a "Payment") would be subject to the excise tax imposed by Section 4999 of the Code or any interest or penalties are incurred by the Executive with respect to such excise tax (such excise tax, together with any such interest and penalties, are hereinafter collectively referred to as the "Excise Tax"), then the Executive shall be entitled to receive an additional payment (a "Gross-Up Payment") in an amount such that after payment by the Executive of all taxes (including any interest or penalties imposed with respect to such taxes), including, without limitation, any income taxes (and any interest and penalties imposed with respect thereto) and Excise Tax imposed upon the Gross-Up Payment, the Executive retains an amount of the Gross-Up Payment equal to the Excise Tax imposed upon the Payments. Notwithstanding the foregoing provisions of this Section 9(a), if it shall be determined that the Executive is entitled to a Gross-Up Payment, but that the present value as of the date of the Business Combination, determined in accordance with Sections 280G(b)(2)(ii) and 280G(d)(4) of the Code (the "Present Value"), of the Payments does not exceed 110% of the greatest Present Value of Payments (the "Safe Harbor Cap") that could be paid to the Executive such that the receipt thereof would not give rise to any Excise Tax, then no Gross-Up Payment shall be made to the Executive and the amounts payable to the Executive under this Agreement shall be reduced to the maximum amount that could be paid to the Executive such that the Present Value of the Payments does not exceed the Safe Harbor Cap. The reduction of the comments payable hereunder, if applicable, shall be made by reducing first the payments under Section 6(a)(i)(B), unless an alternative method of reducing the Payments to the Safe Harbor Cap, only amounts payable under this Agreement (and no other Payments) shall be reduced. If the reduction of the amounts payable hereunder would not result in a reduction of the Present Value of the Payments to the Safe Harbor Cap, no amounts payable under this Agreement shall be reduced pursuant to this provision.

(b)    Subject to the provisions of Section 9(c), all determinations required to be made under this Section 9, including whether and when a Gross-Up Payment is required and the amount of such Gross-Up Payment and the assumptions to be utilized in arriving at such determination, shall be made by McGladrey & Pullen, LLP, or such other certified public accounting firm as may be designated by the Executive (the "Accounting Firm") which shall provide de-

tailed supporting calculations both to the Company and the Executive within 15 business days of the receipt of notice from the Executive that there has been a Payment, or such earlier time as is requested by the Company. In the event that the Accounting Firm is serving as accountant or auditor for the individual, entity or group effecting the Business Combination, the Executive shall appoint another nationally recognized accounting firm to make the determinations required hereunder (which accounting firm shall then be referred to as the Accounting Firm hereunder). All fees and expenses of the Accounting Firm shall be borne solely by the Company. Any Gross-Up Payment, as determined pursuant to this Section 9, shall be paid by the Company to the Executive within five days of the receipt of the Accounting Firm's determination. Any determination by the Accounting Firm shall be binding upon the Company and the Executive. As a result of the uncertainty in the application of Section 4999 of the Code at the time of the initial determination by the Accounting Firm hereunder, it is possible that Gross-Up Payments which will not have been made by the Company should have been made ("Underpayment"), consistent with the calculations required to be made hereunder. In the event that the Company exhausts its remedies pursuant to Section 9(c) and the Executive thereafter is required to make a payment of any Excise Tax, the Accounting Firm shall determine the amount of the Underpayment that has occurred and any such Underpayment shall be promptly paid by the Company to or for the benefit of the Executive.

(c)     The Executive shall notify the Company in writing of any claim by the Internal Revenue Service that, if successful, would require the payment by the Company of the Gross-Up Payment. Such notification shall be given as soon as practicable but no later than ten business days after the Executive is informed in writing of such claim and shall apprise the Company of the nature of such claim and the date on which such claim is requested to be paid. The Executive shall not pay such claim prior to the expiration of the 30-day period following the date on which it gives such notice to the Company (or such shorter period ending on the date that any payment of taxes with respect to such claim is due). If the Company notifies the Executive in writing prior to the expiration of such period that it desires to contest such claim, the Executive shall:

(i)     give the Company any information reasonably requested by the Company relating to such claim,

(ii)     take such action in connection with contesting such claim as the Company shall reasonably request in writing from time to time, including, without limitation, accepting legal representation with respect to such claim by an attorney reasonably selected by the Company,

(iii)     cooperate with the Company in good faith in order effectively to contest such claim, and

(iv)     permit the Company to participate in any proceedings relating to such claim;

11

provided, however, that the Company shall bear and pay directly all costs and expenses (including additional interest and penalties) incurred in connection with such contest and shall indemnify and hold the Executive harmless, on an after-tax basis, for any Excise Tax or income tax (including interest and penalties with respect thereto) imposed as a result of such representation and payment of costs and expenses. Without limitation on the foregoing provisions of this Section 9(c), the Company shall control all proceedings taken in connection with such contest and, at its sole option, may pursue or forgo any and all administrative appeals, proceedings, hearings and conferences with the taxing authority in respect of such claim and may, at its sole option, either direct the Executive to pay the tax claimed and sue for a refund or contest the claim in any permissible manner, and the Executive agrees to prosecute such contest to a determination before any administrative tribunal, in a court of initial jurisdiction and in one or more appellate courts, as the Company shall determine; provided, however, that if the Company directs the Executive to pay such claim and sue for a refund, the Company shall advance the amount of such payment to the Executive, on an interest-free basis and shall indemnify and hold the Executive harmless, on an after-tax basis, from any Excise Tax or income tax (including interest or penalties with respect thereto) imposed with respect to such advance or with respect to any imputed income with respect to such advance; and further provided that any extension of the statute of limitations relating to payment of taxes for the taxable year of the Executive with respect to which such contested amount is claimed to be due is limited solely to such contested amount. Furthermore, the Company's control of the contest shall be limited to issues with respect to which a Gross-Up Payment would be payable hereunder and the Executive shall be entitled to settle or contest, as the case may be, any other issue raised by the Internal Revenue Service or any other taxing authority.

(d)     If, after the receipt by the Executive of an amount advanced by the Company pursuant to Section 9(c), the Executive becomes entitled to receive any refund with respect to such claim, the Executive shall (subject to the Company's complying with the requirements of Section 9(c)) promptly pay to the Company the amount of such refund (together with any interest paid or credited thereon after taxes applicable thereto). If, after the receipt by the Executive of an amount advanced by the Company pursuant to Section 9(c), a determination is made that the Executive shall not be entitled to any refund with respect to such claim and the Company does not notify the Executive in writing of its intent to contest such denial of refund prior to the expiration of 30 days after such determination, then such advance shall be forgiven and shall not be required to be repaid and the amount of such advance shall offset, to the extent thereof, the amount of Gross-Up Payment required to be paid.

10.     Confidential Information. The Executive shall hold in a fiduciary capacity for the benefit of the Company all secret or confidential information, knowledge or data relating to the Company or any of its affiliated companies, and their respective businesses, which shall have been obtained by the Executive during the Executive's employment by the Company or any of its affiliated companies and which shall not be or become public knowledge (other than by acts by the Executive or representatives of the Executive in violation of this Agreement). After termination of the Executive's employment with the Company, the Executive shall not, without the prior written consent of the Company or as may otherwise be required by law or legal proc-

ess, communicate or divulge any such information, knowledge or data to anyone other than the Company and those designated by it. In no event shall an asserted violation of the provisions of this Section 10 constitute a basis for deferring or withholding any amounts otherwise payable to the Executive under this Agreement.

11.   Successors. (a)  This Agreement is personal to the Executive and without the prior written consent of the Company shall not be assignable by the Executive otherwise than by will or the laws of descent and distribution.  This Agreement shall inure to the benefit of and be enforceable by the Executive's legal representatives.

(b)   This Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns.

(c)   Unless waived in writing by the Executive, the Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to assume expressly and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.  As used in this Agreement, "Company" shall mean the Company as hereinbefore defined and any successor to its business and/or assets as aforesaid which assumes and agrees to perform this Agreement by operation of law, or otherwise.

12.   Special Payments by Lee Enterprises ("Lee"). (a) Stay Bonus.  If a Business Combination occurs and Executive chooses to remain in the employ of Lee following the consummation of the Business Combination, Lee shall pay the Executive an amount equal to the aggregate of (i) $670,000 and (ii) the Annual Bonus payable to Executive pursuant to Section 4(b)(ii).  Fifty (50%) percent of the amount will be payable in cash or Common Stock (valued as described below) as the Executive may elect, within 30 days after the consummation of the Business Combination.  The remaining fifty (50%) percent shall be paid by a grant of restricted shares of Common Stock of Lee equal to the quotient of (i) the amount payable to the Executive in the first sentence of this Section, divided by (ii) the average closing price of the Common Stock of Lee for the five (5) business days immediately preceding the Closing Date.  In such event this Agreement shall terminate as of the date of receipt of such payment and, upon termination of this Agreement, neither party shall have any obligation to the other under the terms of this Agreement including, without limitation, the provisions of Sections 4 and 6 hereof.

(b)   Severance Payment.  If a Business Combination occurs and Executive is employed by Lee on the Closing Date of the Business Combination, but does not chose to remain in the employ of Lee under clause (a) above, Lee shall pay the Executive in cash an aggregate amount equal to $570,000 and the Annual Bonus payable under Section 4(b)(ii) of this Agreement.

13.   Miscellaneous. (a)  This Agreement shall be governed by and construed in accordance with the laws of the State of Iowa, without reference to principles of conflict of laws.

## APPENDIX 1

| | | | |
|---|---|---|---|
| 1. | Aggregate sales price of Broadcast Group | $525,000,000 or greater<br>500-524,999,999<br>400-499,999,999 | $70,000*<br>60,000<br>50,000 |
| 2. | Annual OCF goal | 100% or greater<br>99%<br>98%<br>less than 98% | $70,000*<br>65,000<br>60,000<br>50,000 |
| 3. | Up to $60,000 will be awarded based on qualitative assessment of sales process by CEO and COO. | | $60,000* |
| | TOTAL BONUS OPPORTUNITY | | $200,000* |

16

deemed to be a waiver of such provision or right or any other provision or right of this Agreement.

IN WITNESS WHEREOF, the Executive has hereunto set the Executive's hand and, pursuant to the authorization from its Board of Directors, the Company has caused these presents to be executed in its name on its behalf, all as of the day and year first above written.

Colleen Birdnow Brown

LEE ENTERPRISES, INCORPORATED

By: Richard D. Gottlieb
Chairman and CEO

15

The captions of this Agreement are not part of the provisions hereof and shall have no force or effect. This Agreement may not be amended or modified otherwise than by a written agreement executed by the parties hereto or their respective successors and legal representatives.

(b)     All notices and other communications hereunder shall be in writing and shall be given by hand delivery to the other party or by registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

If to the Executive:

Colleen Birdnow Brown
7 Wildhorse Road
Bettendorf, IA  52722

If to the Company:

Lee Enterprises, Incorporated
400 Putnam Building
215 N. Main Street
Davenport, Iowa  52801-1924
Attention:  Chairman and CEO

With copy to:

Lane & Waterman
220 N. Main St., Ste. 600
Davenport, Iowa  52801
Attn:  C. D. Waterman III

or to such other address as either party shall have furnished to the other in writing in accordance herewith.  Notice and communications shall be effective when actually received by the addressee.

(c)     The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.

(d)     The Company may withhold from any amounts payable under this Agreement such Federal, state, local or foreign taxes as shall be required to be withheld pursuant to any applicable law or regulation.

(e)     The Executive's or the Company's failure to insist upon strict compliance with any provision of this Agreement or the failure to assert any right the Executive or the Company may have hereunder, including, without limitation, the right of the Executive to terminate employment for Good Reason pursuant to Section 5(c)(i)-(iv) of this Agreement, shall not be

14



**communications**

Gary Kaseff
Executive Vice President
and General Counsel

(818) 817-6523 Direct Line
GKaseff@emmiswest.emmis.com

<u>PERSONAL AND
CONFIDENTIAL</u>

September 28, 2000

**VIA FEDERAL EXPRESS**

Colleen Birdnow Brown
c/o Lee Enterprises, Incorporated
215 N. Main Street
Davenport, IA 52801

and

7 Wildhorse Road
Bettendorf, IA 52722

Dear Colleen:

This shall confirm our earlier conversations.

A few weeks ago I advised you that if Emmis did not offer you the position of president
of its television group, Emmis intended to terminate your employment on the closing
date. I explained that if Emmis was going to terminate your employment, it would do so
on the closing date and not after the closing date.

This past Tuesday I advised you that Emmis had determined that it would not offer you
the position of president of the television group. I confirmed that Emmis would terminate
your employment on the closing date, as I had previously mentioned to you. I asked you
if you were interested in entering into a new contract with Emmis to provide services in
transition and to consult for a limited period. I asked you to think about it and let me
know the terms under which you would accept the engagement.



EXHIBIT

B

15821 Ventura Boulevard        Suite 685                    p: 818.784.4714        f: 818.784.4059

I tried to reach you by telephone today, but was told that you were out. I would appreciate it if you could call me on Friday, September 29. I understand from you and from Dana Waterman that you believe that our reading of your employment agreement is not correct. I would be glad to discuss this matter with you.


Sincerely,

GARY KASEFF
Executive Vice President
and General Counsel

GK:dt



**communications**

J. Scott Enright
Vice President
Associate General Counsel

October 1, 2000

**Via Hand Delivery**

Ms. Colleen Birdnow Brown
7 Wildhorse Road
Bettendorf, IA 52722

     Re:    Notice of Termination

Dear Ms. Brown:

     This letter is to notify you that, pursuant to paragraph 6 of your Employment Agreement dated as of the 1st day of March, 2000 (hereinafter referred to as the "Agreement"), your employment is terminated effective upon and simultaneously with the Closing Date of the Business Combination (as such terms are defined and referenced in paragraphs 2 and 3 of the Agreement) in which Emmis Television Broadcasting, L.P. has acquired the broadcast segment of Lee Enterprises, Incorporated.

     Very truly yours,

     J. Scott Enright

JSE/djm